TJOFLAT, Circuit Judge, concurring in part and dissenting in part:[1]
When the panel first heard this case, I dissented with respect to its treatment of Lewis's claims under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101 -12213, and Title VII of the Civil Rights Act of 1964 ("Title VII"), id. §§ 2000e-2000e-17 (the "disability-discrimination claim" and the "race-and sex-discrimination claim").[2]
As to the disability-discrimination claim, I argued among other things that Lewis had failed to prove that she was a qualified individual, which is a necessary element of her prima facie case. See Lewis , 877 F.3d at 1021-22 (Tjoflat, J., dissenting). I agreed with the Majority that "whether receiving a Taser shock is an essential function of being a detective is a question for the jury. But surely Lewis would at least have to be medically able to be around Tasers and OC spray." Id. at 1022. The detective position, after all, "requires working with other officers who carry and use such weapons." Id. I explained that "OC spray is an aerosol that can affect anyone in its vicinity; an inadvertent discharge in the Police Department building might affect everyone present. Taser shocks can endanger many others beside the intended recipient." Id.
As to the race- and sex-discrimination claim, I saw two flaws with the Majority's reasoning. Lewis's two comparators were legally insufficient, thus precluding her from proving a prima facie case.[3] Id. at 1022-23. Moreover, Lewis had not painted a convincing mosaic of circumstantial evidence. Id. at 1023. I agreed with the Majority that the record contained sufficient evidence of arbitrary and even pretextual conduct by the police department. Id. But it contained no evidence of intentional discrimination. See id. ("Lewis may have put forth a mosaic of circumstantial evidence that would allow a jury to infer something . But there is no evidence that something would be intentional discrimination .).
This Court vacated the panel's decision and reheard the case en banc "to clarify the proper standard for comparator evidence in intentional-discrimination cases." Lewis v. City of Union City , 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). The *1192 en banc Court held that "a plaintiff proceeding under McDonnell Douglas must show that she and her comparators are 'similarly situated in all material respects.' " Id. at 1226. It then concluded that Lewis's comparators failed to meet that standard.[4] Id. at 1231. The en banc Court did not analyze Lewis's disability-discrimination claim at all or her race- and sex-discrimination claim under the convincing mosaic theory of liability. Id. at 1231 n.20. Instead, it remanded the case to the panel for reconsideration of those claims and theories in the first instance. Id.
Today, I am forced to dissent again. In so doing, I elaborate on my prior reasons for dissenting and offer new grounds for why the Majority errors on this rehearing.
As to the disability-discrimination claim, I continue to believe that Lewis's heart condition, and thus her inability to be exposed to a shock or a spray, prevents her from working as a police detective. After reviewing the record, however, I'm now convinced that she couldn't work in the police department building at all . This irrefutable fact matters because the Majority insists that the essential functions of the position are open to reasonable disagreement and thus are questions of fact. Maybe so. What's not open to reasonable disagreement, however, is that an essential function of being a police officer is, from time to time, being in the police department building. Because Lewis cannot do even that, she is not a qualified individual, and her claim accordingly fails as a matter of law.
Turning to the race- and sex-discrimination claim, I maintain my prior position that the record allows no inference of discriminatory intent on the part of the chief or of anyone else at the department. As it turns out, though, that's not the relevant question. The law requires us to analyze the intent of the person who terminated Lewis. Here, that person is not the chief-or for that matter, anyone at the department-but the city manager. And regardless of what inferences the record might allow about the department, the record allows absolutely no inference of discriminatory intent by the city manager.
I take the two claims in turn. But first, I briefly highlight relevant facts for this appeal that I see as underemphasized by the Majority.[5]
I.
When Lewis first felt concern about being subjected to a shock or a spray due to her previous heart attack, she reached out to her primary-care doctor. The doctor then wrote to offer the department her advice. That advice was unambiguous: Neither the shock nor the spray should be used "either 'on or near' Lewis." See id. at 1219. "Because as a detective Lewis would inevitably be (at the very least) 'near' pepper spray-and under the new policy, Tasers, as well-Chief Odom concluded that the restrictions described by Lewis's doctor prevented her from performing the essential duties of her job." Id.
After receiving the doctor's letter, the department, through the chief, placed Lewis on administrative leave until her doctor released her to "full and active duty." As the en banc Court made clear, however, this moment was never going to come: Lewis's condition was definitively permanent. See id. at 1230 (observing that Lewis "suffered from what her doctor described *1193 as a 'chronic' heart condition and what she herself has called a 'permanent' heart injury" (citations omitted)). In the interim, Lewis was advised to contact human resources personnel to complete her leave paperwork. She was also told, however, that she could use her accrued (paid) leave. I agree with the Majority that the department's handling of Lewis's leave (and thus its decision to terminate her employment) was arbitrary and pretextual, at least when we view the record in her favor, and so I do not rehash those facts here. What is important, though, is what transpired after the department reached its decision, however arbitrary or pretextual it might have been.
The power to terminate Lewis was held not by the chief, or by anyone at the department, but by the city manager, to whom Lewis appealed the department's decision. Pursuant to the appeal, Lewis received an in-person hearing before the city manager. At the hearing, she was represented by a lawyer and afforded the opportunity to present evidence.
Though the record could be clearer,[6] the sole argument Lewis made to the city manager was that, given her condition, the department should have excused her from being exposed to a shock or a spray. So the evidence the Majority relies on today to find sufficient evidence of animus was evidence that was not presented to the city manager. This includes evidence of arbitrariness,[7] pretext,[8] and a sexist remark.[9] The Majority also relies on the same two comparators, both white males, as evidence of animus.[10] Because the events concerning these comparators occurred years after Lewis's appeal, the department's treatment of them was also evidence that was not presented to the city manager.
Recognizing that Lewis could not be exposed to a shock or a spray, the city manager ultimately affirmed the department's decision to terminate her. As he succinctly explained, "Obviously, everybody in the police department has OC spray. When they use it, it's on their clothes and they can be accidently discharged." In other words-and this is important-Lewis's own doctor's advice was the city manager's sole reason for affirming Lewis's termination.
II.
To prevail on her disability-discrimination claim, Lewis must establish, among *1194 other things, that she is a "qualified individual." Mazzeo v. Color Resolutions Int'l, LLC , 746 F.3d 1264, 1268 (11th Cir. 2014) ; 42 U.S.C. § 12112(a). "A 'qualified individual' is 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.' " Mazzeo , 746 F.3d at 1267-68 (quoting 42 U.S.C. § 12111(8) ).
I continue to agree with the Majority that whether being subjected to a shock or a spray is an essential function of the detective position is a question of fact. See Lewis , 877 F.3d at 1022 (Tjoflat, J., dissenting). What the Majority omits from its analysis, however, is that Lewis cannot even be exposed to a shock or a spray. Though the City was under no obligation to reasonably accommodate Lewis's condition,[11] it is worth explaining why the City would still be entitled to summary judgement even if it were. This analysis exposes the Achilles' heel of my colleagues' reasoning: However cautiously they wish to define the "essential functions" of the detective position, see Mazzeo , 746 F.3d at 1267-68 (quoting 42 U.S.C. § 12111(8) ), Lewis is not a qualified individual under any construction of that position.
Recognizing that she could not work as a detective in the field, Lewis identified two positions in the department that would accommodate her condition, one in the communications room and one in the records room. Cf. Boyle v. City of Pell City , 866 F.3d 1280, 1288 (11th Cir. 2017) ("[W]hether a reasonable accommodation can be made for that employee is determined by reference to a specific position ." (emphasis added) (quoting Duckett v. Dunlop Tire Corp. , 120 F.3d 1222, 1224-25 (11th Cir. 1997) (per curiam))). Even if these positions constituted accommodations,[12] Lewis would still face an insurmountable challenge. An ADA plaintiff bears the burden of "showing that the accommodation would allow him to perform the essential functions of the job in question," Boyle , 866 F.3d at 1289, a feat that Lewis cannot achieve.
Lewis's own physician recommended that the spray not be used " 'on or near' Lewis."[13] Lewis , 918 F.3d at 1219. But both proposed positions would still expose her to the spray. As the chief explained, "every room inside the building has a common *1195 air duct return system," and these positions would be within the building. Lest you think that the spray would be so diluted that it couldn't possibly affect Lewis, compare how the spray actually affected someone with how Lewis's doctor surmised it would affect Lewis.
The chief stated that the last time the spray was used in the building, his own secretary began "hacking" so badly that she had to go home for the day. The secretary, mind you, would not react to the spray any differently than you or I.[14] Yet Lewis's reaction to the spray would be worse.
Lewis indicated that she could be affected if she merely "touch[ed] someone who's been sprayed." Her doctor described exposure to the spray as a "stress-related injury" that would be caused by "any increased stress to your heart." She then defined stress as "any physical stress, emotional stress, [or] mental stress." And the doctor wasn't shooting from the hip. Before writing the letter at issue, she apparently researched the spray to understand the risks it posed to Lewis's health.
The Majority purports to come up with "ample evidence" that Lewis could withstand exposure to the spray-contrary to her doctor's letter to the department. See Maj. Op. at 1183 n.10. This evidence is twofold, each bit of which supposedly entails Lewis's doctor contradicting her letter. First, the leave paperwork completed by the doctor, which asks for "job functions the employee is unable to perform," listed the shock (but not the spray). And second, when she spoke to the chief on the phone sometime after sending the letter, the doctor said that the spray was "[s]till a concern, but not as much of a concern as the Taser." To be sure, this evidence establishes that the doctor eventually qualified her letter. But reading my colleagues' opinion, one might (falsely) conclude that the doctor walked back on her letter altogether. In fact, her position that the spray not be used on or near Lewis was unchanging:
Q: As of July 8, 2010,[15] were you still recommending ... that [Lewis] not be exposed to the pepper spray as well? Was that still your recommendation?
A: Yeah.
So try as it might to characterize my review of the record as "fact finding," see Maj. Op. at 1183 n.10, I've done nothing more than observe the testimony of Lewis and of her own doctor-each of whom has effectively advised that Lewis not work in the police department building.[16] If listening to Lewis and Lewis's doctor at summary judgment isn't viewing the evidence in her favor, I don't know what is.
Given Lewis's testimony, as well as that of her own doctor, the point is this: The record contains no evidence of any reasonable accommodation the City could have made for Lewis, in or out of the field. As such, she could not prove, as part of her prima facie case, that she was a "qualified individual." See Mazzeo , 746 F.3d at 1267 (quoting 42 U.S.C. § 12111(8) ).
* * *
The Majority's reversal of the District Court on Lewis's disability-discrimination claim is troubling given the litany of reasons for why Lewis fails to survive summary judgment. Lewis asks this Court to accept that as a police detective, she is *1196 qualified to serve in her position when all her colleagues carry and use non-lethal weapons to which she cannot even be exposed. That argument cannot survive the laugh test. It didn't before the District Court, yet it does before my colleagues. As I explained, because Lewis was only regarded as disabled, the City was not required to accommodate her. But the gravity of Lewis's heart condition, and her corresponding inability to discharge the essential functions of the position, become most obvious once you realize that the City could not have accommodated her even if it had wanted to.
With that, I turn to the Majority's equally troubling treatment of Lewis's race- and sex-discrimination claim.
III.
The en banc Court held that Lewis's comparators were legally insufficient to satisfy the comparator element of her prima facie case under the burden-shifting framework of McDonnell Douglas .[17] Lewis , 918 F.3d at 1231. So the Majority commits itself to assembling a " 'convincing mosaic' of circumstantial evidence," see id. at 1220 n.6, to reverse the District Court's grant of summary judgment for the City. My colleagues' principal error is analyzing evidence about the department instead of evidence about the city manager-the only person whose conduct is relevant to Lewis's claim.
A.
Regardless of whether a Title VII-plaintiff invokes McDonnell Douglas or presents a convincing mosaic of circumstantial evidence, the record must permit the inference of a "causal link" between the "discriminatory animus" and the "discharge or other significant change in the terms or conditions of employment." See Stimpson v. City of Tuscaloosa , 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam). Normally, then, we look only to the conduct of the decisionmaker-the party with the "power to actually discharge the employee." See id.
We deviate from this general rule when "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." See id. at 1332. Our cases have come to call this concept the " 'cat's paw' theory" because the recommender has wielded the decisionmaker as a "mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." See id. The cat's paw theory is not an exception to general principles of causation but a specific application of them in which "the harasser is the decisionmaker," "regardless of which individual actually signs the employee's walking papers." See Llampallas v. Mini-Circuits, Lab, Inc. , 163 F.3d 1236, 1250 (11th Cir. 1998).
To invoke the cat's paw theory, "causation must be truly direct." See Stimpson , 186 F.3d at 1331. "Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee." Pennington v. City of Huntsville , 261 F.3d 1262, 1270 (11th Cir. 2001). So long as the decisionmaker reaches an independent decision, then, any animus by any other actor is purged from the analysis.
Lewis's case is not a cat's paw scenario. Cf. Stimpson , 186 F.3d at 1332 (requiring a showing that "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee"). The decisionmaker who terminated Lewis was the city manager, not the chief and not anyone at the *1197 department. The Majority's claim to the contrary, see Maj. Op. at 1189, is refuted by the City's employee handbook. That handbook makes crystal clear that the city manager is the only person with the power to terminate a promoted employee, like Lewis, who fails to meet performance standards.[18] And Lewis received an in-person hearing before him, a hearing at which the chief, the assistant chief, and the human-resources manager were present. Lewis was represented by a lawyer at the hearing.
The Majority argues that even if the city manager was the person who terminated Lewis (a proposition that seems clear as day to me), the cat's paw theory nonetheless applies because the city manager was supposedly a "mere conduit" for the department. See Maj. Op. at 1189 n.21 (suggesting that the city manager simply rubberstamped the department's decision because it was "operational"). But my colleagues refuse to wrestle with the fact that this Court has never-never -applied the cat's paw theory when, as here, a Title VII-plaintiff is afforded a hearing, counsel, and the opportunity to plead her case to the decisionmaker. See Llampallas , 163 F.3d at 1249 (finding no cat's paw scenario when the decisionmaker "summoned [the plaintiff] ... to investigate the situation," "afforded [her] a private audience of several hours," and "gave her the opportunity to explain the situation"); Stimpson , 186 F.3d at 1332 (same when the decisionmaker "conducted a three day hearing to investigate the charges" and when the plaintiff "was represented by legal counsel and was allowed to put on defense evidence and witnesses" during a hearing); Crawford v. Carroll , 529 F.3d 961, 979 n.21 (11th Cir. 2008) (same when the decisionmaker "reviewed [the plaintiff's] complaint and met with her to discuss the issues it presented"). Simply put, Lewis's hearing was-as a matter of law-an independent investigation that severed causation between the department and the termination.
In brief, the Majority side skirts this cat's paw analysis-and for an obvious reason. It wouldn't find a lick of support in our precedent for its decision to assess animus on the part of any person but the city manager. And as described below, the city manager is as clean as a whistle.
B.
The Majority relies on three categories of circumstantial evidence-broadly speaking, evidence at the department of arbitrary and pretextual decision-making and of comparators being treated differently. Maj. Op. at 1186-89. But Lewis doesn't allege that the city manager acted arbitrarily, pretextually, or treated comparators differently. What's more, he couldn't have acted on this information because he didn't so much as know about it.
Lewis's heart condition, and her related need not to be shocked or sprayed, was the sole reason she presented to the city manager in opposition to her would-be termination. It is thus logically impossible to impute animus to the city manager based on facts that were not before him. Yet facts not before him are precisely what the Majority relies on. Its reliance on the comparators to establish animus is erroneous for a related reason. The comparators were treated differently not by the city manager, but by the department. Indeed, because the department supposedly afforded the comparators favorable treatment, the city manager never crossed paths with them in an appeal.
*1198 In summary, "[Lewis] adduced no evidence that [the city manager's] decision was tainted by [the department's] decision or the retaliatory animus which we assume with respect to [the department]. The record indicates that [the city manager's] decision was completely independent of [the department's] decision, and therefore untainted." See Pennington , 261 F.3d at 1270. The city manager did not hear the evidence on which the Majority hangs its case. And even if some inference could be drawn from the comparators, it isn't an inference about the city manager. For this reason, then, it seems clear why my colleagues implicitly and incorrectly treat Lewis's case as a cat's paw scenario: It's their only hope for reversing the District Court.
C.
One last word. In its recitation of the facts, the Majority cursorily notes Lewis's appeal to the city manager, the hearing, and that Lewis was represented by a lawyer and afforded the opportunity to present evidence. Maj. Op. at 1177. It observes, however, that Lewis "did not present evidence" on the department's handling of her leave. Id. My colleagues, I suspect, feel that we should transform Lewis's case into a cat's paw scenario simply because the decisionmaker did not hear the evidence they find most probative of animus-the goings-on at the department. But Lewis faced the burden of raising the relevant issues to the decisionmaker, and her failure to present certain evidence at the hearing does not undermine the independence of the decision. See, e.g. , Llampallas , 163 F.3d at 1250 ("[The plaintiff], although she had the opportunity to do so, failed to inform [the decisionmaker] ... of the information she possessed that would have put [the decisionmaker] on notice that [the employment decision] may have been motivated by a discriminatory animus."); Stimpson , 186 F.3d at 1332 n.2 ("We curiously note that [the plaintiff] apparently never mentioned any discriminatory motive behind the charges at her hearing before the [decisionmaker]. It seems like that would have been an ideal time and place to do so."). Lewis's failure to do so does, however, negate the usefulness of that evidence to establish any animus by the decisionmaker.
* * *
The Majority pushes to the background the most significant fact relevant to Lewis's race- and sex-discrimination claim: the fact that she pleaded her case before someone outside the department and benefitted from the advice of counsel when she did so. Under the law, that hearing creates a blank slate for our Title VII-analysis, and the record contains no evidence to stain the slate. After hearing Lewis out, the city manager reached the more-than-reasonable decision to terminate Lewis because given her condition, she could not discharge the duties of a detective. Everything else-the department's arbitrary and pretextual conduct, the supervisor's sexist comment, and the comparators-is noise. The city manager did not himself act arbitrarily or pretextually, make the comment, or decide anything with respect to the comparators. Nor did he hear any of that evidence.
IV.
For these reasons, I would affirm the District Court's grant of summary judgment for the City on Lewis's ADA and Title VII claims. I respectfully dissent.

I concur that summary judgment was properly granted in favor of Defendants for all claims against the chief and for the Equal Protection and § 1981 claims against the City.

See Lewis v. City of Union City , 877 F.3d 1000, 1021 (11th Cir. 2017) (Tjoflat, J., dissenting), reh'g en banc granted , opinion vacated sub nom. Lewis v. City of Union City , 893 F.3d 1352 (11th Cir. 2018), and on reh'g en banc sub nom. Lewis v. City of Union City , 918 F.3d 1213 (11th Cir. 2019).

As described below, the Court ultimately vacated the panel opinion and took the case en banc to clarify the appropriate standard.

The reasons, though not relevant to this dissent, were that Lewis and the comparators were "subject to different personnel policies and placed on leave for different underlying conditions." 918 F.3d at 1231.

For facts, I cite to Judge Newsom's opinion for the en banc Court because that interpretation of the record binds the panel on remand.

A fault that lies with Lewis. The plaintiff bears the burden of properly developing the record, but during her deposition, Lewis could not detail anything that she shared with the city manager during the hearing:
Q: Did you have the opportunity ... to present information to Mr. Rapson during the meeting?
A: We did.
Q: Do you remember what you presented?
A: No, I don't.

See Maj. Op. at 1186-87 (chronicling the department's unexpected termination of Lewis, its failure to warn her that using paid leave would preclude her from later using unpaid leave, and its failure to specify a date by which the leave paperwork had to be completed).

See Maj. Op. at 1186-88 (chronicling the department's belief that Lewis's condition was temporary (not permanent), its sudden termination of her, and its imposition of a previously non-existent deadline to complete the leave paperwork).

See Maj. Op. at 1188 (highlighting a comment by one of Lewis's supervisors that he assigned "children and women crimes" to "lady" detectives and "the more aggressive stuff" to male detectives).

See Maj. Op. at 1187-89 (indicating that each received extensive administrative leave, in contravention of the department's policies, despite being physically unfit and that one comparator was offered a transfer to another position that did not require him to meet fitness standards).

This is so because Lewis was merely "regarded as" disabled, see Mazzeo , 746 F.3d at 1268 (quoting 42 U.S.C. § 12102(1) ), not actually disabled. The Majority concedes as much. Maj. Op. at 1179-81. And an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.9(e).

A conclusion that is far from foregone.
"The [ADA] does not require employers to create new positions for employees with disabilities. 'Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified.' " Boyle , 866 F.3d at 1289 (citation omitted) (quoting Willis v. Conopco, Inc. , 108 F.3d 282, 284 (11th Cir. 1997) (per curiam)). The positions that Lewis identified are for "light duty." But light-duty positions aren't guaranteed: The department must first have a need for them, a showing that Lewis hasn't made.
More problematically, however, because Lewis's condition is permanent, she would be on light duty permanently, and permanent placement on light duty transcends the bounds of what's a reasonable accommodation. See, e.g. , Frazier-White v. Gee , 818 F.3d 1249, 1256 (11th Cir. 2016) ("Plaintiff's request for an indefinite extension of light-duty status was unreasonable as a matter of law.").
For both these reasons, then, I doubt that Lewis's proposed positions constitute accommodations within the meaning of the ADA.

Lewis intended to follow this advice. See Lewis Depo. at 180 ("[O]nce I had my heart attack, everything I do, I have to go back to my doctor first.").

At least the record affords no reason to think otherwise.

This was the date that Lewis's doctor spoke with the chief on the phone.

The Majority also states that the city manager's reason for terminating Lewis concerned the shock, not the spray. Maj. Op. at 1183 n.10. But whether he considered the effect of the spray bears not one iota on whether Lewis was a qualified individual.

For a full description of how the framework operates, see Judge Newsom's opinion for the en banc Court. Lewis , 918 F.3d at 1220-21.

It reads, in relevant part, "In the event that a promoted employee fails at any time to meet the required standards of performance for the new position, he/she may be ... terminated if, in the City Manager's sole discretion , reassignment is considered impractical."